

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

FEB 21 2019

CLERK, U.S. DISTRICT COURT
By_____
Deputy

| | | |
|---|---|---|
| GORDON RAY LEWIS, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | No. 4:17-CV-1025-A |
| | § | |
| LORIE DAVIS, Director, | § | |
| Texas Department of Criminal | § | |
| Justice, Correctional | § | |
| Institutions Division, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM OPINION
### and
### ORDER

This is a petition for a writ of habeas corpus pursuant to
28 U.S.C. § 2254 filed by petitioner, Gordon Ray Lewis, a state
prisoner confined in the Correctional Institutions Division of
the Texas Department of Criminal Justice (TDCJ), against Lorie
Davis, director of TDCJ, respondent. After having considered the
pleadings, state court records, and relief sought by petitioner,
the court has concluded that the petition should be denied, in
part, and dismissed, in part.

### I. FACTUAL AND PROCEDURAL HISTORY

On June 28, 2013, a jury in Hood County, Texas, Case No.
CR12234, found petitioner guilty of capital murder and, the state
having waived the death penalty, the trial court assessed his
punishment at life imprisonment without parole. (Clerk's R. 98.)
Petitioner's conviction was affirmed on appeal, the Texas Court

of Criminal Appeals refused his petition for discretionary review, and the United States Supreme Court denied his petition for writ of certiorari. (Docket Sheet 1-2.) Petitioner also sought postconviction state habeas-corpus relief by challenging his conviction in a state habeas application, which was denied by the Texas Court of Criminal Appeals without written order on the findings of the trial court. (SHR02,[1] vol. 1, 5-38 & Action Taken.) This federal petition followed.

This case involves the shooting death of Ormand Gene Sabin, the owner of TJ's Bar and Grill in Granbury, Texas, by Justin Ragan during a robbery of the establishment.[2] The state appellate court summarized the factual background of the case as follows:

> Ormand Gene Sabin owned TJ's Bar and Grill, a restaurant where [petitioner]'s girlfriend, Kimberly Milwicz, had worked until she was fired in late December 2012. Milwicz was angry with Sabin for firing her, and she and [petitioner] wanted to rob the bar for revenge. On the night of January 16, 2013, [petitioner] offered his acquaintance, Justin Ragan, methamphetamines if he would go with him to rob Sabin. Witnesses saw [petitioner] that evening with a pistol and saw [petitioner] and Ragan "suiting up" in black clothes and hoodies as a "disguise." [Petitioner] and Ragan appeared very high on methamphetamines.
>
> The manager of a convenience store near TJ's saw [petitioner] in her store buying a fountain drink around 5:15 or 5:20 a.m. Another witness testified that Ragan's truck sped past him near TJ's sometime around 5:00 a.m. Sabin's employee, Brandy Shirley, discovered

---

[1]"SHR02" refers to the record of petitioner's state habeas proceeding in WR-56,982-02.

[2]It appears the bar and grill was also known as TJ's Private Club & Café. (Reporter's R., vol 10, State's Ex. 77.)

Sabin lying on the floor when she went in to help him open the bar. The phone at TJ's had been ripped from the wall, so Shirley ran to the convenience store and called 911 at 6:24 a.m. Paramedics arrived but could not revive Sabin.

At 6:38 a.m., Ragan called 911 and reported that his truck had been stolen. At 6:57 a.m., someone called 911 and reported that Ragan's truck was abandoned in front of his house with the engine still running. A black bag found inside the truck contained prescription pill bottles in [petitioner]'s name and several unfired nine millimeter bullets. An expert witness testified that the casing found at the crime scene had been loaded in the same magazine as the unfired cartridges found in the truck. A straw and lid from a soft drink found on the passenger-side floorboard contained [petitioner]'s DNA. Police later found a duffle bag of money in the abandoned house next to [petitioner]'s house. [Petitioner] claimed to own the abandoned house and treated it like it was his property. [Petitioner] was eventually arrested and charged with Sabin's murder.

Prior to trial, [petitioner]'s mother was convicted of retaliation against [the state trial judge] Judge Ralph Walton, who was to preside over [petitioner]'s case. [Petitioner] filed a motion to recuse Judge Walton from his case. Judge Walton referred the motion to Judge Jeff Walker who, after a hearing, denied the motion.

(Mem. Op. 1-3.)

The appellate court summarized the testimony at trial as follows:

Ray Yates testified that one day he, [petitioner], and Milwicz were driving to Fort Worth to buy methamphetamine when [petitioner] and Milwicz began discussing "robbing TJ's so that [Milwicz] could have the money, or someone, to go back to California or something like that. She was wanting to get out of Texas. I think she was in trouble already for something."

Rebecca Cleere testified that Ragan was at her

3

house the night before the murder. While he was
visiting, [petitioner] and Milwicz arrived. Cleere
testified that Milwicz was aggravated and was talking
about "wanting [Sabin] to be hurt, and he needed to get
what he had . . . coming to him. She had lost her home,
lost her job, and she blamed it all on him." Cleere
said that Milwicz was trying to get someone to
burglarize TJ's and if she could not get [petitioner]
to do it, she would get someone else to do it. Cleere
testified that [petitioner] asked Ragan to go with him
to rob TJ's. Cleere testified that Ragan "thought it
was a stupid idea to go out there to rob the old man
for a few hundred dollars." [Petitioner] then offered
Ragan methamphetamines if he would go. Cleere also
testified that another person who was sleeping at her
house, Bryce Cobbs, "popped his head into the room,"
and [petitioner] asked him if he too wanted to go to
TJ's.

Later that night, Ragan borrowed a car from a
woman named Christina Munoz, who was visiting Michael
Eubank's house down the street from [petitioner]'s
house. Munoz later decided she wanted her car back.
Yates, who was also at Eubank's house, walked down the
street to see if he could find the car. He found the
car with Ragan and [petitioner]. He testified that
"they looked pretty high" and were "suiting up for
something." He believed they were suiting up for a
robbery because they were wearing dark clothes and
hoodies as a "disguise." He testified that he had a
conversation with [petitioner]. He said,

> A. Well, I was trying to tell him that
> it wasn't a good idea, it was way too late or
> early, however you want to look at it.
>
> Q. What wasn't a good idea?
>
> A. To go rob TJ's.
>
> . . .
>
> I mean pretty much anybody knows that
> the owner of the place gets there at four or
> five o'clock in the morning and—to drink
> coffee and eat breakfast. Some—somebody's
> going to be there or going to show up.

Q. And why is that a problem?

A. Well, if you're going to rob the place, you don't want nobody there.

. . .

[I]t ain't going to go right. Either you're not going to be able to do it or any number of things.

Q. And how did [petitioner] respond to this?

A. He said he got it.

Q. What did that mean to you?

A. Keep out of his business.

Yates testified that [petitioner] owned two guns, including a nine-millimeter pistol, and that he had never seen Ragan with a gun. Yates admitted that the pistol that he saw could have been a BB gun.

Richard McClatchy testified that [petitioner] pulled a pistol or BB gun on him the evening before the murder. He testified that Ragan was very high that evening. McClatchy admitted that he had told police that [petitioner] was also very high and that he believed that "the odds of it being the same gun that was used in the murder that was pointed at [him] was a ten on a scale of one to ten." McClatchy testified that he saw Ragan's truck drive by near TJ's around 5:00 a.m. He previously told the police that he might have seen someone else in the truck but that it was too dark to tell. Joshua Jenkins also testified that he saw [petitioner] and Ragan together that night.

On the morning of the murder, the manager of the convenience store down the street from TJ's saw [petitioner] enter her store around 5:15 or 5:20 a.m. [Petitioner] bought cigarettes and a fountain drink. Justin Pratt testified that [petitioner] had told him that when he came out of the store, Ragan was loading a pistol and said, "Let's go."

Shirley called 911 from the convenience store at

6:24 a.m. Paramedics arrived at the scene at 6:30 a.m. A paramedic testified that because Sabin's body was still warm, he had been dead for less than an hour.

Eubank testified that he was at the convenience store at the time that Shirley ran from TJ's to use the phone. By the time he got back home, he saw Ragan "running from street to street, and then he came and—it looked like he was throwing up to me, he was across the street from my house." Ragan told him, "I shot him." Jenkins also testified that Ragan went to Eubank's house and that Ragan was "out of breath, sweating, [and] pale." Yates too testified that he saw Ragan that morning and that Ragan was "breathing hard, sweating, breathing hard, and seemed kind of out of it, scared." Ragan told Yates that he had shot someone. Ragan used Eubank's phone to report his truck missing at 6:38 a.m.

Munoz saw Ragan later that morning as she was leaving the neighborhood. Ragan asked her for a ride. They stopped at a grocery store in Glen Rose. Ragan had a roll of money that he said he got from the bar. He told Munoz that he had shot somebody. Munoz later told the police that more money was hidden across the street from Eubank's house and "at [petitioner's] place."

Police located money stuffed inside some abandoned chairs across the street from Eubank's house. Police also found a duffle bag of money in the abandoned house next to [petitioner]'s house. [Petitioner]'s ex-girlfriend testified that [petitioner] claimed that the abandoned house next to his mother's home was his property and that he kept a lock on the door. She testified that Milwicz lived with [petitioner] in the abandoned house for a period of time. Eubank also testified that [petitioner] would stay occasionally in the abandoned house. And Jenkins, who lived down the road from [petitioner], testified that he believed that the abandoned house was "part of the same property" as [petitioner]'s mother's house.

When police found Ragan's truck, they discovered a lid and straw on the passenger-side floorboard among a pile of ice. The lid and straw contained [petitioner]'s DNA. The convenience store manager identified the lid and straw as the type sold in her store. Also in the truck was a black bag containing prescription pill bottles in [petitioner]'s name, a bag of marijuana,

baggies, rolling papers, a radar detector, and several unfired nine-millimeter bullets. An expert witness testified that the casing found at the crime scene had been loaded in the same magazine as the unfired cartridges found in the truck.

Pratt testified that in June 2012, [petitioner] had admitted to him that he had been involved with Sabin's murder. Pratt testified, "He told me that—that he—that him and Justin Ragan were at a store right by the bar, and that he had gone in to get something to drink, and he came out and he saw Justin loading a gun, loading a pistol." [Petitioner] told Pratt that he and Ragan went to TJ's but that [petitioner] did not go into the bar. Pratt testified that Milwicz went to the bar at the time of the murder to make sure that Sabin was there and that [petitioner] was "the one that made sure they had a gun."

In January 2012, a few days before Ragan's trial for Sabin's murder, [petitioner] made a phone call from Wise County jail in which he instructed a woman to "plead the Fifth." He also told the woman,

> If you find somebody out there that you figured out that they're going to try to talk on me, you find out where they're at and you get the number and information to my lawyer. He handles every bit of it. And it's not against the law like that. But if you go fucking with them, then it's tampering with a witness. See what I'm saying?

Cleere testified that [petitioner] also called her and told her to "plead the Fifth."

(Mem. Op. 5-10.)

## II. ISSUES

In seven grounds, petitioner challenges the state courts' decisions—

(1) allowing the trial judge's failure to recuse himself;

(2) allowing the trial court's denial of his motion

7

for change of venue;

(3) denying relief under newly discovered DNA forensic-evidence techniques;

(4) allowing the admission of expert testimony linking a bullet casing from the crime scene to ammunition found in Ragan's truck;

(5) allowing trial counsel to render ineffective assistance by failing to investigate and present alibi witnesses on his behalf;

(6) allowing trial counsel to render ineffective assistance by failing to preserve the prosecution's improper jury argument for appellate review; and

(7) allowing the prosecutor to refuse to recuse himself because of a conflict of interest and other misconduct.

(Pet. 6-7g.)

### III. RULE 5 STATEMENT

Respondent believes that petitioner may not have exhausted his third ground in state court but does not otherwise believe that the petition is barred by failure to exhaust, successiveness, or limitations. (Resp't's Answer 5.)

### IV. STANDARD OF REVIEW

A § 2254 habeas petition is governed by the heightened standard of review provided for by the Anti-Terrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C. § 2254. Under the Act, a writ of habeas corpus should be granted only if a state court arrives at a decision that is contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court or that is based on

an unreasonable determination of the facts in light of the record before the state court. 28 U.S.C. § 2254(d)(1)-(2); *Harrington v. Richter,* 562 U.S. 86, 100-01 (2011).

The statute also requires that federal courts give great deference to a state court's factual findings. *Hill v. Johnson,* 210 F.3d 481, 485 (5th Cir. 2000). Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct. The presumption of correctness applies to both express and implied factual findings. *Young v. Dretke,* 356 F.3d 616, 629 (5th Cir. 2004); *Valdez v. Cockrell,* 274 F.3d 941, 948 n.11 (5th Cir. 2001). Absent express findings, a federal court may imply fact findings consistent with the state court's disposition. *Townsend v. Sain,* 372 U.S. 293, 314 (1963); *Pondexter v. Dretke,* 346 F.3d 142, 148 (5th Cir. 2003); *Catalan v. Cockrell,* 315 F.3d 491, 493 n.3 (5th Cir. 2002).

Additionally, when the Texas Court of Criminal Appeals denies a federal claim in a state habeas-corpus application without written opinion, a federal court may presume "that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary" and applied the correct "clearly established federal law" in making its decision. *Johnson v Williams,* 568 U.S. 289, 298 (2013); *Richter,* 562 U.S. at 99; *Schaetzle v. Cockrell,* 343 F.3d 440, 444 (5th Cir. 2004). In such a situation, a federal

court "should 'look through' the unexplained decision to the last related state-court decision providing" particular reasons, both legal and factual, "presume that the unexplained decision adopted the same reasoning," and give appropriate deference to that decision. *Wilson v. Sellers,* 138 S. Ct. 1188, 1191-92 (2018).

## V. DISCUSSION

### A. Recusal

Under his first ground, petitioner claims that the trial judge, the Honorable Ralph Walton, should have been recused from his case because his mother was convicted of threatening to harm the judge, among others, and was an alibi witness in his case. (Pet. 6-6a.) This claim was raised on direct appeal, and, relying solely on state law, the appellate court, in the last-reasoned opinion on the issue, addressed the claim as follows:

> [Petitioner] argues that Judge Ralph Walton should have been recused from his case. [Petitioner]'s mother, Karen Adams, had been convicted of felony retaliation against Judge Walton. When [petitioner] was arrested for Sabin's murder, Adams had threatened to "take out the whole damn bunch," apparently referencing the sheriff, a sheriff's deputy, and Judge Walton. [Petitioner] filed a motion for recusal, arguing that because Adams was going to testify as an alibi witness for [petitioner] in his trial and because Judge Walton was Adams's victim and presiding over [petitioner]'s trial, he should be recused. After a hearing on the motion, Judge Jeff Walker denied [petitioner]'s motion.
>
> ### A. Recusal and the standard of review
>
> We review the denial of a motion to recuse under an abuse of discretion standard. A trial court abuses its discretion if the court acts without reference to any guiding rules or principles, that is, if the act is

arbitrary or unreasonable. An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently in the same circumstances. Nor does a mere error in judgment rise to an abuse of discretion.

We apply a reasonable person standard in determining whether a recusal motion should have been granted. The question is whether a reasonable member of the public at large, knowing all the facts in the public domain concerning the judge's conduct, would have a reasonable doubt that the judge is actually impartial. Accordingly, the need for recusal is triggered only when a judge displays an "attitude or state of mind so resistant to fair and dispassionate inquiry" as to cause a reasonable member of the public to question the objective nature of the judge's rulings.

Courts enjoy a "presumption of judicial impartiality" that "is not defeated by the mere assertion of bias based on a trial judge's previous judicial relationship with a defendant." The movant bears the burden of proving that recusal is warranted, and it is a high one. That burden is only satisfied when the movant provides facts demonstrating the presence of bias or partiality "of such a nature and extent as to deny the movant due process of law."

**B. Denial of [Petitioner]'s motion was not an abuse of discretion**

[Petitioner] argues that recusal was required in this case under the reasoning of *Whitehead v. State*, . . . . In that case, Whitehead wrote a letter to his girlfriend threatening his therapist, his probation officer, and Judge Herod, the judge who presided at the trial revoking his community supervision. Whitehead was charged only with retaliation against his probation officer, and Judge Herod presided at his retaliation trial. Whitehead was subsequently convicted.

Whitehead appealed his retaliation conviction on the ground that Judge Herod was disqualified from presiding at his trial under article 30.01 of the code of criminal procedure. The court of criminal appeals interpreted the phrase "may be the party injured" to mean that a judge is disqualified "if the evidence

shows that he was among the defendant's victims in the
criminal transaction or episode at issue, such that a
reasonable person would harbor doubts as to the judge's
impartiality."

[Petitioner] acknowledges that *Whitehead* pertained
to disqualification under article 30.01, not recusal
under rule 18b of the rules of civil procedure as was
sought in this case. He argued at the hearing that
Judge Walton was "an injured party and he would be a
part of the criminal episode," but he also admitted
that there was no evidence that [petitioner] injured
Judge Walton. [Petitioner] claimed, but did not explain
how, Judge Walton's rulings on the admissibility of
testimony from an alibi witness who had previously been
convicted of threatening him would create the
appearance of bias.

Judge Walker's comments on the record demonstrate
that in making his ruling, he referenced appropriate
guiding rules and principles. He explained,

> Merely that [Judge Walton] had been an
> injured party in the allegations, not the
> complaint but the allegations that were made
> by [Petitioner]'s mother, allegedly made by
> his mother, was reason enough for him to get
> out of that case and he did so. It does not
> pour over to this case. There must be
> independent evidence of any bias before he is
> recused. He is not an injured party in
> [petitioner's] case. And so your claims that
> he's disqualified under Code of Criminal
> Procedure 30.01 [are] not well founded. But
> you did not limit your motion to that
> particular statute . . . . I'm looking at
> this as the pleadings are applied to Rule
> 18(a) of the Texas Rules of Civil Procedure,
> which apply in motions to recuse and there is
> no evidence to show that the Judge has a bias
> against [petitioner]. Now, when you talk
> about, all right, well, the judge knows one
> of the witnesses or the Judge knows something
> bad about one of the witnesses, or for that
> matter the Judge knows something good about
> one of the witnesses, does that disqualify
> the Judge? No. You have to take that in light
> of how the Judge will rule, as opposed to not

> the witness but to the party who is before
> the Judge. And there's no evidence to show
> that the Judge would be biased against
> [petitioner] for any act that his mother may
> have committed or not committed. And for
> those reasons the motion will be denied.

> Judge Walker found that [petitioner] did not meet
> his burden to demonstrate that Judge Walton's judicial
> history with one witness in [petitioner]'s trial made
> him "resistant to fair and dispassionate inquiry," and
> we cannot disagree. Judge Walker's ruling was not
> outside the zone of reasonable disagreement and was
> therefore not an abuse of discretion.

(Mem. Op. 13-17.)

To the extent petitioner argues that Judge Walton and/or Judge Walker abused their discretion under state standards of judicial recusal, the alleged violation of state law does not merit federal habeas-corpus relief. *See Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991); *Lewis v. Jeffers,* 497 U.S. 764, 780 (1990); *Pulley v. Harris,* 465 U.S. 37, 41 (1984). A federal habeas court will not grant relief unless errors in a state-court proceeding resulted in the "denial of fundamental fairness" under the Due Process Clause. *Neal v. Cain,* 141 F.3d 207, 214 (5th Cir. 1998) (citing *Porter v. Estelle,* 709 F.2d 944, 957 (5th Cir. 1983)).

Further, deferring to the state court's application of state law, as well as its factual findings, petitioner has not demonstated that the state court's decision is contrary to, or an unreasonable application of federal law on the issue or is based on an unreasonable determination of the facts in light of the

evidence presented. To secure habeas relief on the basis of a due-process-clause argument that the judge failed to recuse himself, a petitioner must establish that a genuine question exists concerning the judge's impartiality. *See Bigby v. Dretke,* 402 F.3d 551, 559 (5th Cir. 2005) (citing *Liteky v. United States,* 510 U.S. 540, 552 (1994)). Bias is not lightly established because ordinarily courts "presume that public officials have properly discharged their official duties." *See id.* (quoting *Bracy v. Gramley,* 520 U.S. 899, 909 (1997)). There must be an appearance of impropriety which rises to the level of a fundamental defect resulting in a complete miscarriage of justice. *See Richardson v. Quarterman,* 537 F.3d 466, 474-75 (5th Cir. 2008). Petitioner makes no such showing. He does not describe circumstances establishing that the judge had a presumptive or actual bias or prejudice against him, and there is no indicia in the record that the relationship between the judge and petitioner's mother negatively impacted his case.[3] General allegations of bias or prejudice are insufficient to establish a

---

[3]Presumptive bias occurs when a judge may not actually be biased, but has the appearance of bias such that "the probability of actual bias . . . is too high to be constitutionally tolerable." *Bunton v. Quarterman,* 524 F.3d 664, 672 (5th Cir. 2008) (quoting *Withrow v. Larkin,* 421 U.S. 35, 47 (1975)). The Supreme Court has only found that a judge's failure to recuse constitutes presumptive bias in three situations: (1) when the judge "has a direct personal, substantial, and pecuniary interest in the outcome of the case," (2) when he "has been the target of personal abuse or criticism from the party before him," and (3) when he "has the dual role of investigating and adjudicating disputes and complaints." *Id.* (quoting *Bigby v. Dretke,* 402 F.3d 551, 559 (5th Cir. 2005)). Actual bias exists when a judge is actually biased in the petitioner's own case.

constitutional violation. *See id.* at 474. Petitioner has not demonstrated that the state court's decision to deny relief is contrary to, or involved an unreasonable application of, clearly established federal law or is the result of an unreasonable determination of the facts in light of the evidence presented. Petitioner is not entitled to relief under his first ground.

Under his seventh ground, petitioner also claims that the prosecutor should have recused himself from petitioner's case "because of his conflict of interest and other misconduct." (Pet. 7g.) Although unclear, petitioner appears to allege that, taken together, the prosecutor should have recused himself or engaged in misconduct for the following reasons:

→ the prosecutor had a conflict of interest because he had a personal relationship with the victim;

→ the prosecutor never placed his co-defendants on the stand to testify because he knew "the truth would have been exposed that petitioner had no part in the crime";

→ the prosecutor called witnesses against petitioner who had a motive and bias to lie; and

→ the prosecutor compelled witnesses to testify falsely in exchange for immunity or the ability to "work off" their drug-related arrests.

(Pet. 7g.)

These claims were raised for the first time in petitioner's state habeas application, and the state courts did not enter express factual findings or legal conclusions on the issue. Thus, this court will imply fact findings consistent with the state

15

courts' rejection of the claims and presume the state courts applied the correct "clearly established federal law" in making its decision. Having done so, petitioner has not demonstrated that the state court's decision to deny relief is contrary to, or involved an unreasonable application of, clearly established federal law or is the result of an unreasonable determination of the facts in light of the evidence presented.

As to the first claim, the duty of a prosecutor is not simply to win a case, but to see that justice is done. *Berger v. United States,* 295 U.S. 78, 88 (1935); *Dickson v. Quarterman,* 462 F.3d 470, 479 (5th Cir. 2006). A criminal defendant is entitled to an impartial prosecutor who can make an unbiased use of all the options available to the prosecutor's office, however "[p]rosecutors need not be entirely neutral and detached[.] In an adversary system, they are necessarily permitted to be zealous in their enforcement of the law." *Marshall v. Jerrico, Inc.,* 446 U.S. 238, 242, 248 (1980). A federal court evaluates a prosecutorial-misconduct claim by determining whether the prosecutor made an improper remark and, if so, whether the improper remark substantially affected the defendant's right to a fair trial. *See Trottie v. Stephens,* 720 F.3d 231, 253 (5th Cir. 2013).

Petitioner claims that the prosecutor was conflicted because in closing argument he stated that he knew the victim and that

"it's personal. This is real." (Reporter's R., vol. 8, 49.)
However, the state habeas judge, who also presided at
petitioner's trial, was able to observe the prosecutor's conduct
and demeanor during trial and clearly found no indication that
the prosecutor was unable to perform his duties in a fair and
impartial manner. Furthermore, even assuming the prosecutor
crossed the line with his remarks, petitioner presents no clear
and convincing evidence that the misconduct substantially
affected the fairness of his trial.

Petitioner also claims that the prosecutor did not call his
co-conspirators to testify because he knew "the truth would have
been exposed that petitioner had no part in the crime." This
claim is conclusory, with no evidentiary support in the record.
Such claims are insufficient to raise a constitutional issue. *See
Koch v. Puckett,* 907 F.2d 524, 530 (5th Cir. 1990).

Finally, petitioner claims that the prosecutor called
witnesses against him who had a motive and bias to lie and who
were compelled to testify falsely in exchange for immunity or the
ability to "work off" their drug-related arrests. However, the
defense had the opportunity to cross-examine each witness to
expose any motive and/or bias. And, it is common practice for a
suspect, after being arrested, to be released with the
understanding that he will cooperate with law enforcement during
the pendency of his case in order to "work off" his sentence or

17

otherwise receive a more favorable disposition. In fact, such arrangements are expressly promoted under federal law. *See* FED. R. CRIM. P. 35. Petitioner is not entitled to relief under his seventh ground.

## B. Change of Venue

Under his second ground, petitioner claims that his motion for change of venue should have been granted because the victim was a "well known local town owner" in Granbury; local newspaper articles regarding the crime mentioned petitioner and his alleged role in the crime; his co-conspirators had already been tried and convicted of the crime; certain veniremembers admitted the media had affected them and/or that they could not be fair and impartial in the case; and the lead prosecutor and his former defense counsel knew the deceased. (Pet. 6, 6b.) In support of his motion to change venue, petitioner presented his own affidavit and the affidavits of two residents of the county, providing—

> I have read [petitioner]'s Motion for Change of Venue and I am personally aware of the matters stated therein; and they are all true and correct to the best of my knowledge. I am personally aware that there exists in said County so great a prejudice against [petitioner] that he cannot receive a fair and impartial trial in this County; and that the amount of publicity generated as a result of the instant case has been so great that it has produced so much prejudice in the community that the likelihood of [petitioner] receiving a fair and impartial trial is doubtful.

(Clerk's R. 49-50.) At a pretrial hearing on the motion,

18

petitioner also introduced newspaper articles regarding the shooting. (Reporter's R., vol 3, 72; SHR02, vol. 1, 148-58.)

The state responded to the motion by presenting controverting affidavits from two residents, stating—

> I have read [petitioner]'s Motion for Change of Venue and all attached affidavits filed in this case; and I am knowledgeable of [petitioner]'s affiants' means of knowledge of the matters asserted in their affidavits. Their means of knowledge are not sufficient and/or they are not credible in their assertions. Furthermore, I am aware that there was news coverage of the events giving rise to the instant case. I am also aware that there are approximately 400 citizens available for jury service in this County on the week of June 24, 2013. I believe that a fair jury could be picked to try the instant case in this County.

(Id. at 56-57.)

At the pretrial hearing, the state also called two witnesses. The Hood County District Clerk, who is also the jury administrator, testified that there were 42,925 potential jurors currently available in Hood County, which has a population of more than 51,000; that she did not think there had been an unfair amount of publicity regarding the case; that she felt, out of the jury pool summoned, petitioner would be able to get a fair trial unbiased by any publicity; and that there was no trouble seating the jurors in the previous two trials of petitioner's co-conspirators. (Reporter's R., vol. 3, 59-65.[4]) The second witness, an investigator for the district attorney's office,

---

[4]The judge's copy of this volume of the reporter's record is not paginated; thus, the pagination in the ECF header is used.

testified that he obtained the state's controverting affidavits; that petitioner's affiants were not credible; and that he believed petitioner could get a fair trial in Hood County. (Id. at 67-71.) At the conclusion of the hearing, the trial court denied petitioner's motion but reserved the right to revisit the matter at the time of jury selection. (Id. at 75.) Petitioner renewed his motion at the close of voir dire, but it was denied. (Reporter's R., vol. 4, 153-54.)

By the court's count, of the veniremembers seated in the first four rows, approximately 28 acknowledged that they had heard or read about the shooting at TJ's bar. (Id. at 154.) Defense counsel questioned them as a group regarding whether or not they had formed an opinion about the case that would influence their verdict as a result of having heard about it, and only two veniremembers responded in the affirmative. (Id. at 147.) Both were later dismissed for cause. (Id. at 147.)

This claim was raised for the first time in petitioner's state habeas application, and the state courts did not enter express factual findings or legal conclusions on the issue. Thus, this court will imply fact findings consistent with the state courts' rejection of the claim and presume the state courts applied the correct "clearly established federal law" in making its decision. Having done so, petitioner has not demonstrated that the state courts' decision is contrary to, or an

unreasonable, application of federal law or is the result of an
unreasonable determination of the facts in light of the evidence
presented.

Relying on well-established precedent of the United States
Supreme Court, the Fifth Circuit has stated:

> The Sixth Amendment guarantees a criminal defendant the
> right to a fair trial by an impartial jury. The failure
> to provide such a trial violates due process. However,
> the Constitution does not require that jurors be
> ignorant of the facts and issues involved. "[E]xtensive
> knowledge in the community of either the crimes or the
> putative criminal is not sufficient by itself to render
> a trial constitutionally unfair." To succeed on a claim
> of denial of a fair trial because of adverse pretrial
> publicity, a habeas petitioner must demonstrate that
> "the particular jurors selected for service in his case
> were biased against him."
>
> Alternatively, prejudice may be presumed when the
> record demonstrates that the trial was conducted in an
> inherently prejudicial atmosphere "utterly corrupted by
> press coverage." The presumption applies only in
> "extreme" cases.

*Coble v. Davis,* 682 Fed. App'x 261, 274 (5th Cir. 2017)
(citations omitted).

The pretrial publicity in this case was not extreme and the
record is devoid of any indicia that the jury selected was not
impartial and did not give petitioner a fair trial. *See Busby v.
Dretke,* 359 F.3d 708, 725 (5th Cir. 2004). *See also Moore v.
Johnson,* 225 F.3d 495, 504 (5th Cir. 2000) (stating that
generally, a habeas petitioner seeking "relief as a result of
pretrial publicity must demonstrate an actual, identifiable
prejudice on the part of members of the jury that is attributable

to that publicity"). Petitioner is not entitled to relief under his second ground.

## C. DNA Testing

Under his third ground, petitioner claims that his right to due process was violated because the "standard" used in the DNA testing in his case was "recently held void by the courts and called . . . voodoo science." (Pet. 7b.) The DNA found on the straw and lid of the cup found on the floorboard of Ragan's abandoned truck revealed a mixture of DNA, which included petitioner's and that of two other individuals. (Reporter's R., vol. 6, 200-01.) The state's forensic expert testified that based on a statistical analysis, "the probability of selecting an unrelated person at random who could be a contributor to the profile is approximately 1 in 536.5 million Caucasians, 1 in 14.15 billion for blacks, and 1 in 4.354 billion for Hispanics." (Id. at 201.)

Over three years after petitioner's trial, the state sent petitioner a letter informing him that "forensic scientists have recently become aware that a common statistical method they used may not always have taken into account certain important scientific limitations" and instructing him to fill out the form attached to the letter and send it to the address given if he "would like to have [his] case recalculated on the DNA mixture issue." (SHR02, vol. 1, 120.) Petitioner apparently did so.

Petitioner also filed a motion in the trial court for DNA testing under Chapter 64 of the Texas Code of Criminal Procedure, wherein he asserts that his case had been referred to the "DNA Mixture Project Review" and that the retesting had not yet been conducted. (Id. at 173.) In this petition, petitioner asserts that no recalculation was ever completed because, even without the DNA evidence, project review determined that there was sufficient other evidence to support his conviction. (Pet. 7a.)

As noted by respondent, petitioner's motion for DNA testing was filed in his state habeas action, and there is no indication in the record that a ruling has been made on the motion for purposes of exhaustion. (Resp't's' Answer 15 n.3.) Petitioner acknowledges that the trial court did not address the issue but asserts that the Texas Court of Criminal Appeals "generally denied the claim for relief without written order." (Pet. 7.) The court is not persuaded. The record does not reflect that the trial court has made the requisite findings required by Chapter 64 or appointed counsel for petitioner. Nor does the record reflect that petitioner had directly appealed the decision on the motion to the court of appeals "in the same manner as an appeal of any other criminal matter." *See* TEX. R. CRIM. PROC. ANN. arts. 64.01, 64.02, 64.03, 64.04, 64.05 (West 2006 & Supp. 2017).

State habeas petitioners must fully exhaust state remedies before seeking federal habeas relief. *See* 28 U.S.C. § 2254(b);

*Fisher v. Texas*, 169 F.3d 295, 302 (5th Cir. 1999). This requires a petitioner to present his claim(s), in a procedurally proper manner, to the highest available state court for review. *See O'Sullivan v. Boerckel,* 526 U.S. 838, 844-45 (1999); *Carter v. Estelle,* 677 F.2d 427, 443 (5th Cir. 1982). Generally, a Texas prisoner may satisfy the exhaustion requirement by presenting both the factual and legal substance of his claims to the Texas Court of Criminal Appeals, the state's highest court, in either a petition for discretionary review or a state habeas-corpus proceeding pursuant to article 11.07 of the Texas Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 11.07 (West 2015); *Alexander v. Johnson*, 163 F.3d 906, 908-09 (5th Cir. 1998); *Bd. of Pardons & Paroles v. Ct. of Appeals for the Eighth Dist.*, 910 S.W.2d 481, 484 (Tex. Crim. App. 1995).

Unquestionably, petitioner has not yet exhausted his state court remedies with respect to this claim as his motion for forensic DNA testing was either not properly filed by petitioner or remains pending in the convicting court. Because the state courts should have the first opportunity to litigate petitioner's claim and there is no absence of available state corrective procedures, federal intervention at this juncture would be inappropriate. 28 U.S.C. § 2254 (b) & (c); *Deters v. Collins*, 985 F.2d 789, 796-97 (5th Cir. 1993). Accordingly, petitioner's claim under his third ground should be dismissed, without prejudice, so

that petitioner can fully exhaust his claim in state court.

**D. Expert Testimony**

Under his fourth ground, petitioner claims that the trial court erred by "allowing the admission of expert testimony linking a bullet casing from the crime scene to ammunition from [Ragan's] vehicle because it was unreliable." (Pet. 7, 7b-7c.) According to petitioner, "federal law holds that the use of magazine marks to connect items found in a defendant's apartment was unreliable where the magazines making the tool marks on fired and unfired cartridges were not found by the police and were therefore not available to make test marks for comparison," which the court of appeals wrongly ignored in affirming his conviction. (Id. at 7b.)

This argument was raised and rejected on direct appeal. Based solely on relevant state law, the appellate court, in the last-reasoned opinion on the issue, thoroughly analyzed the claim, as follows:

> [Petitioner] argues that the trial court erred by failing to exclude expert testimony linking a bullet casing found at the crime scene to ammunition found in the vehicle because it was unreliable.
>
> **A. Standard of review**
>
> We review a trial court's decision to admit or exclude scientific expert testimony under an abuse of discretion standard. The proponent of the scientific evidence must demonstrate through clear and convincing evidence that the evidence is reliable. "'[R]eliability depends upon whether the evidence has its basis in sound scientific methodology,'" which "'demands a

certain technical showing.'" [Under *Kelly v. State,*]
[t]he test for expert reliability requires that (1) the
underlying scientific theory be valid, (2) the
technique applying the theory be valid, and (3) the
technique have [sic] been properly applied on the
occasion in question. Factors that could affect a trial
court's determination of expert reliability include,
but are not limited to: (1) the extent to which the
underlying scientific theory and technique are accepted
as valid by the relevant scientific community, if such
a community can be ascertained; (2) the qualifications
of the testifying expert; (3) the existence of
literature supporting or rejecting the underlying
scientific theory and technique; (4) the potential rate
of error of the technique; (5) the availability of
other experts to test and evaluate the technique; (6)
the clarity with which the underlying scientific theory
and technique can be explained to the court; and (7)
the experience and skill of the person(s) who applied
the technique on the occasion in question.

### B. The evidence

James Jeffress is a forensic scientist in the
firearm toolmark section of the Texas Department of
Public Safety Crime Laboratory in Garland, where he has
been employed for over five years. He has a bachelor's
degree in biology from Texas A & M University and a
master's degree in forensic science from Virginia
Commonwealth University. Jeffress underwent an
eighteen-month training program on firearm and toolmark
identification. His training included "discussion of
machining processes, historical firearm tool
development, as well as performing thousands of
microscopic comparisons of toolmarks made by various
tools." He has been a guest lecturer in forensic
courses at the University of Texas at Dallas and has
taught classes in high schools, middle schools, and
local civic groups. Jeffress has published three
articles in the Scientific Journal of the Association
of Firearm and Tool Mark Examiners. Jeffress has
testified as an expert in about eighteen cases in
approximately eight different counties.

Jeffress explained toolmark examination to the
court:

Firearm toolmark examination is based on

the premise that no two manufactured objects
are exactly alike. When you make a tool of
any sort, whether it's a set of pliers or the
barrel to a firearm, these tools are made by
a metal-on-metal forming process.
Essentially, you whittle it down from large
blocks of metal.

And during this formation process,
microscopic chips are created by the wearing
of the tool. So just as if you were whittling
a block of wood, your knife would get dull,
so too do these machining processes. These
microscopic chips are irregular in nature and
randomly distributed. These microscopic
imperfections are unique to that tool and
that tool alone, and . . . are then imparted
on any softer material that that tool
touches.

He also explained that toolmark identification "is a
subjective determination, but it's based on objective
criterion. It's based on the objectivity that is
without bias and based on direct observation."

Jeffress testified that he conducts toolmark
identification tests "daily" and has done so for over
five years, but he does not necessarily do magazine lip
mark analysis daily. He testified that he has done this
specific type of identification in "at least five
cases." He admitted that he has never testified in
court specifically about magazine lip analysis.

Jeffress testified that toolmark comparison is

widely accepted within the forensic science
community because we had a scientific working
group for firearms identification. It is a
federally funded group sponsored by the
National Institute of Justice. We also have
the Association of Firearm Toolmark
Examiners, which is an international
organization of firearm toolmark examiners.
It's been a recognized discipline in the
United States since the 1930s and in the
Texas Department of Public Safety since 1935.
It's been admitted in U.S. courts.

27

Jeffress identified three different journals that publish peer-reviewed articles on toolmark identification: the Association of Firearm Toolmark Examiner Journal, Forensic Science International, and the Journal of Forensic Science. The State presented to the court five articles specific to toolmarks left by gun magazines.

Jeffress provided a PowerPoint presentation, which was admitted into evidence. The presentation cited a number of studies on "consecutive manufacture" testing. The studies noted which guns and knives are the most difficult for matching toolmarks because of "subclass carryover," which he explained occurred when "a tool [makes] some of the same marks from one piece to the next. They're not individual characteristics because they're not unique to a specific tool." Jeffress's presentation also discussed "black-box validation studies," which he described as "very similar to double-blind studies conducted for medical trials." He listed the error rates associated with each validation study.

Jeffress discussed two different tests used to identify the potential rate of error. The first, called the Brundage study, was started in 1994, and "that test has been distributed to hundreds of examiners nationally and internationally." In the Brundage test, "[p]articipants are given a set of 15 unknown bullets, and with an error rate of approximately .6 percent, we've—other than that, 99.4 percent of respondents have been able to correctly identify all of those bullets to those consecutively manufactured barrels."

Jeffress also discussed the annual proficiency tests from Collaborative Testing Services. He testified that there is a 1.4% error rate on that exam, but he noted, "These tests may be taken by people that aren't trained examiners, they may be taken by trainees. They also may not have a hundred percent response rate, and also might not be checked as thoroughly as standard case work is, much like all of ours go through verification." Jeffress testified,

> [W]e have a wide variety of standards
> and controls in place in our laboratory.
> Every microscopic comparison we make is
> independently analyzed by another trained

firearms examiner. It's a process we termed "verification." And all of our work is one hundred percent verified.

So another qualified examiner looks at all of my microscopic comparisons, and they must reach the same conclusion that I do.

Jeffress said that his conclusions in this case were verified.

## C. Discussion

[Petitioner] argues that Jeffress was not a reliable witness because he had never before testified about toolmarks from magazines. However, he also testified that he has done this specific type of identification in "at least five cases." He has over five years' experience in toolmark analysis and has three published, peer-reviewed articles on the subject. His knowledge, skill, experience, training, and education weigh in favor of reliability.

[Petitioner] also argues that Jeffress could not recreate toolmarks with the actual tool because the gun was never recovered. However, Jeffress testified that having the murder weapon to use for testing does not result in a better probability that the conclusions from the comparison are correct. He said that having the actual tool that made the mark is "immaterial if you still have sufficient agreement of microscopic marks." He explained, "We frequently get cartridge cases for which no gun is ever recovered, and we are able to compare and say that they were fired in a single, yet unknown firearm." Jeffress discussed the process by which toolmarks are compared, the error rate in toolmark identification, and the verification process used to support his conclusions. These too weigh in favor of reliability.

[Petitioner] next argues that Jeffress's procedures were "controlled by the investigator." Jeffress testified that the first cartridge he compared to the spent cartridge found at the crime scene matched, so he called the investigator to let him know his conclusion. The investigator told him "that one was sufficient." There was no evidence that the investigator controlled Jeffress's methods of

29

comparison, directed him to which cartridge to test, or influenced Jeffress's conclusions or those of the examiner who verified them. [Petitioner] claims that additional testing would have either strengthened or undercut Jeffress's opinion. But testing of the additional cartridges would only have determined whether each of those cartridges had been cycled through the same magazine as the tested and spent cartridges; it would not have strengthened or weakened Jeffress's conclusion regarding the first tested cartridge.

Finally, [petitioner] argues that there is no evidence supporting Jeffress's expert opinion because the articles that the State submitted to the trial court were not admitted into evidence and therefore cannot be considered. The *Kelly* test requires evidence of "the existence of literature supporting or rejecting the underlying scientific theory and technique." Jeffress testified to the existence of supportive articles, copies of such articles were provided to the trial court and opposing counsel, and [petitioner] cross-examined Jeffress in detail regarding their substance while referring to the article as "what the State has entered into evidence." Under the standard of review, we cannot say that the State's failure to admit the articles into evidence tips the *Kelly* factors, on the whole, away from reliability particularly in light of the testimony elicited by [petitioner] concerning the substance of the articles.

[Petitioner] argues that "this case is a mirror image" of *Sexton.* In *Sexton,* the court of criminal appeals concluded "based on the record before [it], that the underlying theory of toolmark examination could be reliable in a given case, but that the State failed to produce evidence of the reliability of the technique used in [that] case." However, there are a number of differences in the testimony presented in *Sexton* and that presented in this case. The testifying expert in *Sexton* "did not say whether he was familiar with the manufacturing process of the magazine or magazines that he said left identifiable marks on the live rounds and cartridge cases." Further, the expert acknowledged that he had never matched magazine marks in a case before.

In the present case, the trial court conducted a

*Daubert* hearing at which the State offered both Jeffress's testimony as well as a PowerPoint presentation by Jeffress that aided in establishing his knowledge and explanation of the magazine lip analysis procedure, the scientific method behind it, that method's validity and accuracy, and its acceptance in the scientific community. Jeffress explained in detail and with the aid of pictures how the manufacturing process creates microscopic imperfections that are unique to a tool or magazine. Jeffress testified that when looking at these microscopic marks, firearm toolmark experts look for reproducible patterns that sufficiently "agree[ ]." He explained, "[W]hen [we] go through training, we look at thousands and thousands of microscopic comparisons. It gives us a baseline of what constitutes . . . enough . . . marks for identification. . . . [W]e develop this pattern threshold of what a sufficient agreement consists of." He defined "sufficient agreement" as the "chance that another tool could have made those marks is considered a practical impossibility." Through Jeffress's testimony, the State in this case, unlike in *Sexton,* met the required showing of a technical basis for the trial court to find that the testimony was based in sound science and was reliable.

In *Sexton,* the State introduced a treatise that contradicted its own expert's testimony that the technique of magazine mark comparison was one hundred percent accurate. The court of criminal appeals held that the expert's bare assertion, contradicted by available literature, weighed in favor of excluding the testimony. Jeffress, on the other hand, testified that in order to claim that a method is one hundred percent accurate,

> you must test every firearm or every tool ever made, that ever has been made, and ever will be made. So that is when we say "practical certainty" or "to a reasonable degree of scientific certainty" because that's what the limits of science provide. We cannot be absolutely 100 percent certain of anything.

He explained that the process he employed was much like what a doctor or radiologist does in diagnosing a disease. He said,

> [I]t is a subjective determination, but it's
> based on objective criterion. It's based on
> the objectivity that is without bias and
> based on direct observation. So based upon
> looking at these patterns, we look at them
> and we essentially—we made that conclusion
> that they were, in fact, made from the same
> tool.

He then testified that his opinion was that, within a
reasonable degree of scientific certainty, the
toolmarks matched in this case. Jeffress's testimony
does not mirror the "bare assertions" in *Sexton*; in
fact, his thorough explanation of the method's accuracy
weighs in favor of allowing the testimony. We therefore
do not find *Sexton* controlling in this case.

The deficits present in the expert's testimony in
*Sexton* were not seen here in Jeffress's testimony. The
State presented clear and convincing evidence that the
proferred [sic] scientific evidence is sufficiently
reliable.

(Mem. Op. 17-26. (citations omitted).)

Deferring to the state court's application of state law on
the issue, which is consistent with the admissibility criteria
for scientific evidence announced in *Daubert v. Merrell Dow
Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), as well as the
court's finding of reliability, petitioner has not demonstrated
that the state court's decision is contrary to, or an
unreasonable application of federal law or is the result of an
unreasonable determination of the facts in light of the evidence
presented. Petitioner is not entitled to relief under his fourth
ground.

**D. Ineffective Assistance of Counsel**

Under his fifth and sixth grounds, petitioner claims he received ineffective assistance of trial counsel. A criminal defendant has a constitutional right to the effective assistance of counsel at trial. U.S. CONST. amend. VI, XIV; *Strickland v. Washington*, 466 U.S. 668, 688 (1984). To establish ineffective assistance of counsel, a petitioner must show (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that but for counsel's deficient performance the result of the proceeding would have been different. *Strickland*, 466 U.S. at 688. In applying this test, a court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Id.* at 668, 688-89. Judicial scrutiny of counsel's performance must be highly deferential and every effort must be made to eliminate the distorting effects of hindsight. *Id.* at 689.

Ineffective-assistance-of-counsel claims are considered mixed questions of law and fact and, therefore, are analyzed under the "unreasonable application" standard of § 2254(d)(1). *See Gregory v. Thaler,* 601 F.3d 347, 351 (5th Cir. 2010). Where, as here, the state court adjudicated the ineffective-assistance claims on the merits, this court must review petitioner's claims under the "doubly deferential" standards of both *Strickland* and § 2254(d). *Cullen v. Pinholster,* 563 U.S. 170, 190 (2011). In such cases, the "pivotal question" for this court is not "whether

defense counsel's performance fell below *Strickland*'s standard";
it is "whether the state court's application of the *Strickland*
standard was unreasonable." *Harrington v. Richter,* 562 U.S. 86,
101, 105 (2011).

Petitioner claims that counsel was ineffective by failing to
investigate and call Justin Ragan, Sandra Smith, and Bryce Cobbs
as alibi witnesses. (Pet. 7d-7e.) According to petitioner, Ragan
would have testified that he committed the crime and acted
without any participation from petitioner; that the gun he used
in the crime was not the same gun petitioner allegedly gave to
him; that he stole the bag of pills out of petitioner's car; and
that petitioner was not at Cleere's house at the same time as
Kimberly and Ragan on the night before the murder. (Pet. 7d.) He
asserts Sandra Smith, his sister, who lived with Cleere would
have testified that petitioner was not at Cleere's house with
Milwicz and Ragan the night before the murder and that petitioner
was not talking about his involvement in the murder. (Id. at 7e.)
Finally, he asserts Bryce Cobbs would have also testified that he
was not at Cleere's house with Milwicz and Ragan the night before
the murder. (Id.)

Counsel responded to petitioner's allegations via affidavit
in the state habeas proceeding as follows (any spelling,
grammatical, and/or punctuation errors are in the original):

> **Allegation:** Counsel did not investigate, develop
> evidence, and present testimony from . . . Justin

Reagan, Sandra Smith, and Bryce Cobb.

**Summary Response:** The investigation of this case by this affiant was fairly substantial and happened during the pendency from appointment till trial. The presentation of witnesses, especially convicted co-conspirators or potentially chargeable co-conspirators, is fraught with danger and carries risk to the defendant. There were reasons not to call these witnesses. Finally, the State never produced any notes, recordings, or a scintilla of anything on Mr. Bryce Cobbs other than his name on a witness list and the report.

**Bryce Cobb**

The State never produced a shred of evidence in its' files that Danny Briley drove ten hours to see Mr. Cobbs. There was nothing in the State's file about this trip and interview, there was absolutely no conversation between myself and the prosecutor in this case that had to anything to do with Bryce Cobbs. When I received this letter from the petitioner after the trial, I was furious that the State did not give me this information and I spoke with the prosecutor soon after. His answers did not satisfy me.

The State did not call Mr. Cobbs in any of the prior trials.

This court has worked with Danny Briley before. This court knows that Briley makes notes on many of his interrogations or meetings. It is unbelievable that Briley didn't give these notes to the prosecutors on this case. If he didn't do so, his actions were unethical and damning. If he did turn his notes over and the prosecution did not turn over the notes this case should be re-tried.

This court should know that I don't have any special access to the computer system that the prosecutor suggests I have access to, to find out which jail Mr Cobbs was, at any point in time. The fact is, Briley's notes should have been in the file and I could have made a decision to drive to Oklahoma. I then could have filed an out of state subpoena to bring him down to trial if, he would have provided exculpatory or relevant information.

I do not want to speculate what would have been, had the prosecutor, who is bound by his ethical duty under *Brady* to inform the defense of any potentially exculpatory evidence. At some point in time hopefully in my lifetime, defense attorneys should be able to somewhat trust the words of the prosecutors who represent the State of Texas. However, there are too many what ifs, in this scenario, the fact remains the State did not turn over the notes, I couldn't find Mr. Cobbs with the information I had at the time nor the access to the special law enforcement databases that would have told me where he resided.

**Justin Ragan:** I am at a loss as to why calling Mr. Ragan to testify at the petitioner's trial would be a good trial strategy. Mr. Ragan, flying high on a methamphetamine trip, animated to the interrogating officers that someone gave him the gun that he shot the decedent with. After a lot of winking and nodding, hemming and hawing, Justin Regan said he got the gun from "Flash" the Petitioner's nickname. This dreadful statement would rightfully scare any defense attorney.

If we consider the Petitioner's strategy and we succeed in getting Ragan to say that the Petitioner was not at Cleere's house when this plan was hatched, the prosecution would have the opportunity to ask Ragan about the gun used in the crime. This would be a heads I win, tails you lose scenario. If Ragan claims responsibility for the crime and claimed he acted alone, the prosecution will be able to attempt to impeach his testimony with his interrogation. While this impeachment evidence shouldn't be used as evidence of guilt I could not take that chance. It was too risky at the time. The jurors would be stuck on that testimony like glue. This isn't a strategy I was willing to gamble on.

. . .

**Sandra Smith:** Mrs. Smith is the Petitioner's sister. She was listed as a witness for the prosecution. She was listed as such because she told an investigating officer that she spoke with the Petitioner the morning of the offense. She relayed the conversation she had to the officer. She said the Petitioner told her he was worried about the murder at TJs (the location of the murder), that he was with Justin Regan the morning of

the shooting. She can also testify that the Petitioner
was in an intimate relationship with Kimberly Miliwicz
the other co-conspirator. This affiant was in contact
with Sandra Smith throughout the pendency of the case,
and I believe we had a strategy in place to call her to
testify if there was a very good reason to do so.

Law: This court in forming its conclusions of law
should consider:

A reviewing court indulges a strong presumption that
counsel's conduct was not deficient but rather the
product of sound trial strategy.

Effective assistance does not mean perfect or errorless
counsel.

A decision whether to present witnesses is largely a
matter of trial strategy.

Counsel's failure to call witnesses is irrelevant
absent a showing that such witnesses were available and
[petitioner] would benefit from their testimony.

(Supp. SHR02 10-13 (citations omitted).)

Based on the record, counsel's affidavit, and his own

recollection of the trial proceedings, the state habeas court

entered factual findings consistent with counsel's affidavit.

(Id. at 20-21.) Based on its findings, and applying the

*Strickland* standard, the court concluded, generally, that

petitioner failed to overcome the presumption that counsel's

action or inaction might be considered sound strategy. (Id. at

24.) The court further concluded that, given the overwhelming

evidence of petitioner's guilt, petitioner could not show

prejudice because any error that may have been committed by

counsel did not contribute to his conviction or punishment. (Id.

37

at 23.)

The state court applied the proper standard and, deferring to the state court's factual findings, the court's application of *Strickland* is not objectively unreasonable. Complaints based upon uncalled witnesses are not favored in federal habeas review because "speculations as to what these witnesses would have testified is too uncertain." *Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002); *Alexander v. McCotter,* 775 F.2d 595, 602 (5th Cir. 1985). Moreover, the decision whether to present a witness is considered to be essentially strategic, and such decisions by counsel are virtually unchallengeable and generally do not provide a basis for habeas-corpus relief. *See Strickland,* 466 U.S. at 689; *Alexander,* 775 F.2d at 602. Therefore, to show the prejudice required to support an ineffective-assistance claim premised on the failure to call a witness, a petitioner must show that the witness was available and would in fact have testified at trial in a manner beneficial to the defense. *Evans,* 285 F.2d at 377.

Of the three, petitioner submitted only an affidavit by Bryce Cobbs, wherein he states that, although he did not remember being at Cleere's house on the night of the alleged conspiracy, he did recall that petitioner was at Cleere's house alone with Cleere and Sandra Smith and that petitioner, Kimberly, and Justin Ragan were never at Cleere's house at the same time. (SHR02, vol.

1, 167.) However, the state habeas court clearly found the affidavit incredible. Credibility determinations by a state court, as well as its factual findings, are presumed correct and afforded deference, absent clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1); *Coleman v. Quarterman,* 456 F.3d 537, 2006 WL 1991686, at *2 (5th Cir. 2006); *Galvan v. Cockrell,* 293 F.3d 760, 764 (5th Cir. 2002). Petitioner has not rebutted the presumption.

Further, if the only evidence of a missing witness's testimony is from the defendant, courts view with great caution claims of ineffective assistance based on failure to call that witness. *See Sayre v. Anderson,* 238 F.3d 631, 635 (5th Cir. 2001); *Lockhart v. McCotter,* 782 F.2d 1275, 1282 (5th Cir. 1986). Petitioner failed to present affidavits by Ragan or Smith in the state-court proceedings. Failure to produce affidavits or similar evidentiary support from uncalled witnesses is fatal to petitioner's claim. *Sayre,* 238 F.3d at 636 (complaint of uncalled witnesses failed where petitioner failed to present affidavits from the missing witnesses).

Lastly, petitioner claims that counsel was ineffective by failing to object, request an instruction to disregard, and/or move for a mistrial when the prosecutor stated that "I knew Gene Sabin. It -- it's personal" during closing argument. (Pet. 7f-7g.) Counsel responded to the allegation in his affidavit as

39

follows (any spelling, punctuation, and/or grammatical errors are in the original):

> There were multiple objections during argument from both sides and the trial court overruled every single one of them by saying it is "argument". I still consistently object to improper closing argument on this and many other cases tried in this court even though most if not all objections are overruled. In this case the deceased was known by some people in the area and [the prosecutor] was obviously one of those people. I didn't believe at the time of the pendency of the trial that [the prosecutor] harped on his relationship with the deceased in such a way that would have ultimately swayed the jury to convict.
>
> Law: This court in forming its conclusions of law should consider:-
>
> (Jury argument must fall within one of the following four categories: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; and (4) plea for law enforcement.)
>
> This court would have to decide if the sentence fell outside the bounds of a proper jury argument. If it did, were the statements to the jury so extreme, manifestly improper, injected new and harmful facts into the case that they deprive the defendant of a fair and impartial trial.

(Supp. SHR02 14 (citations omitted).)

Based on the record, counsel's affidavit, and his own recollection of the trial proceedings, the state habeas court entered factual findings consistent with counsel's affidavit. (Id. at 22.) Based on its findings, and applying the *Strickland* standard, as noted before, the court concluded, generally, that petitioner failed to overcome the presumption that counsel's action or inaction might be considered sound strategy. (Id. at

24.) The court further concluded that, given the overwhelming evidence of petitioner's guilt, petitioner could not show prejudice because any error that may have been committed by counsel did not contribute to his conviction or punishment. (Id. at 23.)

Improper jury argument by the state does not present a claim of constitutional magnitude in a federal habeas action unless it is so prejudicial that the state court trial was rendered fundamentally unfair within the meaning of the Due Process Clause of the Fourteenth Amendment. *See Jones v. Butler,* 864 F.2d 348, 356 (1988). To establish that a prosecutor's remarks are so inflammatory, the petitioner must demonstrate that the misconduct is persistent and pronounced or that the evidence of guilt was so insubstantial that the conviction would not have occurred but for the improper remarks. *Id.* Petitioner has made no such showing. Petitioner is not entitled to relief under his fifth or sixth grounds.

For the reasons discussed herein,

It is ORDERED that the petition of petitioner for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 be, and is hereby, dismissed, without prejudice, as to ground three for failure to exhaust state-court remedies and that the petition as to the remaining grounds be, and is hereby, denied. The court further

ORDERS that a certificate of appealability be, and is hereby,
denied.

SIGNED February _2 1_ , 2019.


JOHN MCBRYDE
UNITED STATES DISTRICT JUDGE